NOTICE

Decision filed 04/06/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230571-U

NO. 5-23-0571

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-2479 |
| | ) | |
| CHARLTON MERCHANT, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Moore[*] and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction for first degree murder where the defendant failed to prove a mitigating factor by a preponderance of the evidence; the defendant forfeited any issue regarding the admission of surveillance video evidence; the trial court did not abuse its discretion in its rulings regarding the admission of certain video evidence or in fashioning a sentence; and the trial court did not misapprehend the sentencing range.

¶ 2    After a bench trial held from January 10 through January 12, 2023, the defendant, Charlton Merchant, was convicted of first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2020)), and unlawful possession of weapons by a felon (UUWF) in violation of section 24-1.1(a) of the Code (*id.* § 24-1.1(a)). The defendant was sentenced to 55 years' incarceration in the Illinois Department of Corrections (IDOC) for the

_____

[*]Justice Moore fully participated in the decision prior to his retirement. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6 (1992).

1

first degree murder conviction and 3 years' incarceration for the UUWF conviction, to be served consecutively, with a mandatory supervised release (MSR) period of three years for each count.

¶ 3    The defendant now appeals his conviction and sentence, arguing (1) that his first degree murder conviction should be reduced to second degree murder because he had an unreasonable belief that he needed to act in self-defense, (2) that the trial court abused its discretion in allowing the introduction of surveillance videos and trial counsel was ineffective for failing to object to the admission of the videos, (3) that the trial court abused its discretion when it admitted 14 Snapchat[1] videos over the defendant's objection, and (4) that his sentence was excessive. For the following reasons, we affirm the judgment of the trial court.

¶ 4                                    I. BACKGROUND

¶ 5    The defendant was charged by information on October 13, 2020, with four counts of first degree murder in violation of sections 9-1(a)(1), (a)(2), and (a)(3) of the Code (*id.* §§ 9-1(a)(1), (a)(2), (a)(3)), one count of mob action (*id.* § 25-1(a)(1)), one count of aggravated battery (*id.* § 12-3.05(c)), and one count of UUWF (*id.* § 24-1.1(a)). He was subsequently charged with the same seven counts by indictment on November 5, 2020. Prior to and during trial, the State moved to *nolle prosequi* two of the four first degree murder counts, the mob action count, and the aggravated battery count. The trial court granted the motions.

¶ 6    Relevant to this appeal, count 1 alleged that the defendant committed first degree murder in that, on October 11, 2020, in Madison County, Illinois, the defendant, without lawful justification and by means of personally discharging a firearm, and with the intent to kill or cause great bodily harm to Terence Hicks, shot Terence Hicks, thereby causing the death of Terence

---

[1]Snapchat is a cellular telephone application that allows users to send photographs, videos, and messages to other users.

Hicks. Count 7 alleged that the defendant committed UUWF in that he was a person who had been convicted of a forcible felony, aggravated criminal sexual assault, on August 11, 2008, in Madison County, Illinois, case No. 08-CF-812, and on October 11, 2020, in Madison County, Illinois, he knowingly possessed a firearm on or about his person.

¶ 7    The defendant waived his right to a jury trial and, prior to his bench trial, filed an affirmative defense asserting that he had acted in self-defense. He also entered into a written stipulation prior to trial, and paragraph 2 of the stipulation stated as follows:

> "Timothy Bruggeman, Mark Unnerstall, Dustin Snyder, John Hentrich would testify as to the foundation of the surveillance from Spirits Lounge, Polo Laundromat, Firehouse Bar, and River Bender respectfully. The parties agree that it is not necessary to call these witnesses in trial to admit the surveillance from each of those locations. The police officer who seized each surveillance video shall be allowed to testify as to its foundation and contents."

¶ 8    A bench trial on the remaining two counts of first degree murder, as well as the UUWF count, took place from January 10 to January 12, 2023. At trial, the State introduced the above stipulation as People's exhibit 284. The trial court asked defense counsel if the stipulation was accurate and defense counsel confirmed that it was. The trial court then clarified that the parties were stipulating that the police officer who seized the video could testify as to its foundation and its contents, and defense counsel again confirmed that the trial court accurately described the stipulation.

¶ 9    Katelynn Lindsey was called as a witness for the State. Lindsey testified that she had been in a relationship with Gegaty Newsome for six years, and the victim, Hicks, was Newsome's nephew. She explained that on the night before the shooting, she was in downtown Alton, Illinois

3

with her sister, Kiara Simmons, and Newsome. Lindsey and Simmons wanted their picture taken together, and Simmons asked Aareon Vaughn, who was a stranger passing by, to help her onto a trash can for the photograph. Vaughn then joined their group. Later that night, Vaughn repeatedly made offensive comments to Lindsey, and Newsome eventually punched Vaughn in the face. Vaughn then separated from the group.

¶ 10    Lindsey testified that on the next night, her group, which included herself, Simmons, Newsome, and Hicks, had returned to downtown Alton. The area has multiple bars, and after going to several, the group happened to walk past Vaughn, who was leaning into a vehicle. Vaughn noticed them and asked Newsome if he was the one who had punched Vaughn the previous night. Newsome said yes. Vaughn then threw his cellular telephone down and tried to punch Newsome. Newsome blocked the punch and tried to duck and run. As the fight moved up the street, the defendant and another individual, later identified as the defendant's friend Derrick Courtland, exited the vehicle that Vaughn had been leaning into and ran up to the fight with their hands in their pockets. At that time, Hicks was trying to break up the fight between Vaughn and Newsome. Lindsey put her hand on the defendant's chest and said "please," because she thought he was about to jump into the fight. The defendant then pulled out a gun and fired a shot. Lindsey could see the gun, which was black and small, and she could see the defendant's face when he fired it. Lindsey testified that after she regained her hearing, she looked and saw Hicks on the ground. On cross-examination, Lindsey clarified that Hicks was not participating in the fight.

¶ 11    Lindsey's sister, Kiara Simmons, was also called and testified that on the night of the shooting, after some time at another bar, she, Newsome, Lindsey, and Hicks walked toward the Firehouse bar. Simmons and Lindsey saw Vaughn, and then Vaughn and Newsome saw each other. There were some words and then Vaughn and Newsome tried to hit each other. Vaughn struck

4

Newsome, and Newsome fell to the ground. Newsome got up, and he and Vaughn continued to fight. Newsome was moving backwards and Vaughn was facing Newsome, but both Newsome and Vaughn were participating in the fight. Simmons testified that she bent down to pick up Newsome's glasses and cellular telephone, and while she was bent down, she saw two people run by her. She heard a gunshot shortly after that.

¶ 12    Gegaty Newsome also testified for the State. He first described the altercation with Vaughn that had occurred the night before the shooting. He was unsure whether he actually made contact with Vaughn during that first altercation, but he did attempt to punch Vaughn in the face. Newsome then testified that on the night of the shooting, he, Lindsey, Simmons, and Hicks attempted to go to the Firehouse bar. Newsome saw Vaughn approaching him and felt threatened, so he removed his glasses and cellular telephone. As he was doing this, Vaughn asked Newsome why he had hit Vaughn and then, without waiting for an answer, Vaughn punched Newsome in the face. Newsome attempted to block Vaughn's strikes and back away. Newsome then saw a man running with his hands in his pockets, and then Newsome heard a gunshot. The fight was moving up a hill, with Newsome retreating up the hill and Vaughn advancing. After the gunshot, Newsome saw the defendant, Vaughn, and others run, and that is when he realized that someone was shot.

¶ 13    The State also called the defendant's friend, Derrick Courtland, as a witness. Courtland testified that on the evening of the shooting, he was carjacked. He and Vaughn went to the defendant's home and reported the carjacking to law enforcement. Courtland, Vaughn, and the defendant then went to the downtown Alton area. Courtland had not wanted to go out because of the carjacking, and he therefore remained in the defendant's vehicle because of his state of mind. The defendant and Vaughn exited the vehicle and went into a bar. Courtland did not see the defendant and Vaughn until an hour or two later, when they returned to the vehicle and tried to get

5

Courtland to come out with them. During this conversation, a man unknown to Courtland passed by and Vaughn began yelling at the man. Vaughn then proceeded to the back of the vehicle and a fight broke out. Courtland did not see how the fight started.

¶ 14    Courtland testified that he and the defendant then exited the vehicle. As the two approached the fight, Courtland testified that a man picked up a beer bottle and tried to hit somebody in the group with it. Courtland was afraid of getting hit with the bottle, but he was not afraid of dying from the bottle. In response to that fear, Courtland backed up and moved away. The bottle slipped and broke on the ground. Courtland was no longer afraid of the bottle after it was lying on the ground. The fight continued and he heard a gunshot. He did not know who fired the shot at that time because he was focused on the chaos of the scene. After the shot was fired, Courtland, the defendant, and Vaughn immediately went back to the vehicle. Vaughn was dropped off, and then the defendant drove himself and Courtland to a laundromat.

¶ 15    On cross-examination, Courtland testified that he told police that a male with dreadlocks grabbed a bottle. He agreed that he told police that the defendant pushed the male backwards but did not shoot at that time. He also agreed that he told police that the male then tried to hit him with the bottle but missed, and the male then tried to hit Vaughn.

¶ 16    Christopher Reichgert, a bystander, testified that on the night of the incident, he was standing outside of the Firehouse bar leaning against a wall. He stated that a fight had started down the street and was moving closer to his location. He saw two individuals fighting and a large group in the vicinity of the fight. He saw one individual get hit in the face and fall to the ground but then get up immediately and continue fighting. He was surprised nobody else was involved in the fight at that point. He then heard a loud noise like a firecracker, somebody stated that it was a gunshot, and he ducked down behind the wall. He and others realized it was not just a firecracker when they

6

saw someone lying on the ground, and that is when they ducked down. He had not noticed the individual on the ground participating in the fight and had not noticed that individual prior to seeing him on the ground. On cross-examination, Reichgert agreed that his attention was focused on the fight, and he might not have noticed what was going on in his peripheral vision.

¶ 17    Sergeant Michael Roderfeld of the Alton Police Department also testified for the State. Sergeant Roderfeld testified that he arrived at the scene near the Firehouse bar in downtown Alton, Illinois, at around 2:20 a.m. on October 11, 2020, where he learned that Hicks had been shot once in the abdomen and had been transported to a local hospital. Sergeant Roderfeld stated that he took photographs of the scene of the incident, and then testified as to what he observed and photographed. Sergeant Roderfeld testified that People's exhibits 101 and 102 were photographs that he took depicting items at the scene, including a broken beer bottle with some moisture on the ground.

¶ 18    Sergeant Roderfeld then testified that at approximately 8:30 a.m., he spoke to the owner of the Firehouse bar, Dustin Snyders. During that conversation, Sergeant Roderfeld was able to observe video footage captured by the bar's surveillance cameras. Multiple individuals who had been identified as being involved in the incident were observed by Sergeant Roderfeld in the video footage including Courtland, Vaughn, and the defendant.

¶ 19    Sergeant Roderfeld testified that the video was approximately an hour and 30 minutes long and was time-stamped. He stated that footage relating to the incident began at 12:41 a.m., reflected in the video as time stamp 00:41. Still images from the video were shown to Sergeant Roderfeld, marked as People's exhibits 261 through 273. Sergeant Roderfeld testified that the still images fairly and accurately depicted the video at the corresponding time stamps. He was then shown an item marked as People's exhibit 1 and testified that it was an envelope containing the flash drive

7

where he had placed the surveillance video footage from the Firehouse bar. He further testified that the footage on the flash drive was the same video that he had watched at the Firehouse bar, and that it was the same video that the still images depicted at the corresponding time stamps. Sergeant Roderfeld was then asked, "And are they all fair and accurate depictions of that video?" He responded that they were, and the State moved for People's exhibits 261 through 273—the still images—and People's exhibit 1—the video footage—to be admitted into evidence. Defense counsel stated, "Subject to my cross, thank you." The trial court then stated, "Subject to cross they will be admitted and you may publish." Defense counsel did not object to the exhibits being admitted into evidence.

¶ 20    Sergeant Roderfeld then testified as to the identities of the individuals in the still images from the video and described what each person was doing in each of the still images. He then testified that the portion of the video relating to the incident was approximately one to two minutes long. The State advanced the video footage to 00:41 and played it for the trial court.

¶ 21    Beginning at time stamp 00:41:00, the video footage contained in People's exhibit 1 depicted a portion of sidewalk in front of the Firehouse bar as well as the adjacent roadway. There were tables set up on the sidewalk and multiple individuals were seated at the tables or standing nearby. There was a wall between a portion of the sidewalk and the roadway that was approximately waist-high. A woman walked from the sidewalk into the adjacent roadway, and the individuals at the tables began looking at and pointing to an incident occurring off-camera to the right of the screen. The woman noticed the incident and quickly walked further across the street and off-camera towards the incident. Immediately thereafter, an individual identified as Vaughn entered the frame quickly from the direction of the off-camera incident. Vaughn moved away from the incident, taking two to three steps in a fast sideways or backwards motion. Vaughn then

8

changed direction and quickly moved forward, back towards the off-camera incident. At the same time, just as the time stamp changed from 00:41:29 to 00:41:30, another individual came into the frame from the direction of the incident, identified by Sergeant Roderfeld as the victim Hicks. Hicks took two to three large steps backwards, and then abruptly doubled over, and then fell to the ground.

¶ 22    Prior to Hicks falling, at the same time that Hicks was moving backwards, the woman previously on camera came back into view with an individual identified as Courtland, both walking at a normal pace. At the same moment that Hicks abruptly doubled over, at time stamp 00:41:32 on the video, the woman and Courtland quickened their pace, looked at Hicks, and then began to run. Also at the same moment that Hicks doubled over, a person sitting at a table on the nearby sidewalk immediately stood up and quickly left the area. Less than a second later, as Hicks fell to the ground, the other individuals in the frame began to react; some ducked down behind the short wall and some left the area. The video did not depict Hicks moving back towards the off-camera incident at any time after he appeared in the footage, and after he doubled over and fell to the ground he did not move from that spot, although at one point he did attempt to get back up.

¶ 23    After the video footage was played at trial, Sergeant Roderfeld again testified that it was the same video that he had obtained from the Firehouse bar. Defense counsel did not object at any point during Sergeant Roderfeld's testimony regarding his description of the people or events depicted in the Firehouse bar surveillance video.

¶ 24    Sergeant Roderfeld went on to testify extensively regarding the investigation, including identification of the vehicle in which the individuals involved in the incident had left the scene and items associating that vehicle with the defendant. Relevant to this appeal, Sergeant Roderfeld testified that the day after the incident, October 12, 2020, he went to Spirits Lounge, a business

9

near where the incident occurred, and met with Timothy Brueggeman, the owner of the business. Brueggeman permitted Sergeant Roderfeld to view the business's video surveillance footage from the early morning hours of October 11, 2020. Sergeant Roderfeld testified that by that time, a vehicle possibly involved in the incident had been identified, and he also had a description of the clothing Vaughn had been wearing. When Sergeant Roderfeld watched Spirits Lounge's surveillance video, he was able to observe both the vehicle and Vaughn in the footage. While watching the video, Sergeant Roderfeld noticed an issue with the time stamp, so the live recording at the time he was present at the business was pulled up. Sergeant Roderfeld was able to observe from his live viewing of the contemporaneous surveillance footage that the time stamp on the video was approximately five minutes behind the real time. He then testified that People's exhibit 2 was an envelope with the flash drive containing Spirits Lounge's surveillance video. He testified that the video was a fair and accurate depiction of the video he had observed at Spirits Lounge. The video was then admitted into evidence subject to cross-examination.

¶ 25    Sergeant Roderfeld then testified that Spirits Lounge's surveillance video depicted Vaughn somewhat in the back of the vehicle. Vaughn then turned and walked towards the Firehouse bar. Sergeant Roderfeld testified that just over a minute later, the video depicted Vaughn running back to the vehicle and entering it. The State then asked Sergeant Roderfeld if, at time stamp 00:38:14, he saw someone else running along the sidewalk towards the vehicle. Sergeant Roderfeld responded, "Correct." At this time, defense counsel objected to the leading nature of the questions regarding what was going on in the video. The trial court asked defense counsel if his talking objection was a hearsay objection. Defense counsel answered in the affirmative and the objection was sustained, and the State was directed to rephrase the question. The State then asked Sergeant Roderfeld what he observed in the video at 00:38:14, and he responded to that question and an

10

additional question regarding the content of the video with no further objection from defense counsel.

¶ 26    Sergeant Roderfeld also testified that during the investigation it was determined that a bag containing the firearm used in the shooting might be at the home of the defendant's sister. He further outlined how it was determined that the bag had been taken to another residence by the sister, and that the bag was ultimately recovered from the other residence. Sergeant Roderfeld testified that the bag's contents included ammunition and an SCCY Industries 9-millimeter handgun, admitted as People's exhibit 15. The State later presented expert testimony connecting the shell casing recovered from the scene, and the projectile recovered from the body of Hicks, to the handgun recovered from the bag, along with expert testimony identifying the defendant's fingerprint on the handgun.

¶ 27    Photographs were also admitted during Sergeant Roderfeld's testimony depicting a silver or gray mask at the home of the defendant. When the State moved to admit the mask into evidence, defense counsel objected on grounds of relevance. The State responded that Snapchat videos would be utilized later in the trial depicting the defendant wearing the mask recovered from the defendant's home, and at the same time in possession of a handgun that appeared to be the handgun from the shooting, so the mask was offered for the purpose of identification. The mask was admitted into evidence subject to cross-examination.

¶ 28    During cross-examination, Sergeant Roderfeld testified that a broken beer bottle was on the ground at the scene, that it still had the label attached, and that it appeared that the bottle was dropped rather than thrown. Sergeant Roderfeld also agreed that one ammunition shell casing had been found at the scene and there was only evidence that one shot had been fired.

11

¶ 29    The State also called Trooper Brad Lemarr of the Illinois State Police as a witness. Relevant to this appeal, Trooper Lemarr testified that People's exhibit 84 was a photograph of evidence marker 2, which marked the spot where Hicks fell, and that People's exhibit 95 was a photograph of evidence marker 7, which showed the neck of a broken bottle with no cap on it. Trooper Lemarr further testified that evidence marker 2 was more than a full car length from evidence marker 7.

¶ 30    The State also presented testimony from Dr. Gershom Norfleet, who was qualified as an expert in forensic pathology and testified that Hicks died as a result of a gunshot wound to the abdomen. Dr. Norfleet testified that the bullet entered Hicks through the right side of his abdomen and went backward, leftward, and downward, ultimately stopping at his left hip. He also testified that there was no evidence to indicate that Hicks had been shot at close range, meaning within about three feet.

¶ 31    Sergeant Joe Splittorff of the Alton Police Department also testified for the State. Sergeant Splittorff was qualified as an expert in the field of cellular telephone forensic analysis. Sergeant Splittorff testified that he responded to the scene of the incident, facilitated transport of witnesses to the police station, conducted witness interviews, conducted forensic analysis on some of the cellular telephones, and obtained search warrants for various digital companies. Sergeant Splittorff then testified concerning various items of digital evidence in the case.

¶ 32    Sergeant Splittorff testified that he obtained a search warrant for the records relating to the defendant's Snapchat account. He identified People's exhibits 25, 25(a), 25(b), and 25(c) as records responsive to that search warrant, and the State moved to admit those exhibits. The trial court asked defense counsel, "Subject to your cross?" Defense counsel responded, "Yes, Your Honor." The trial court then asked, "And let's just say an ongoing objection to these records?" Defense counsel responded, "Yes. Yes." People's exhibit 25(b), a screenshot identifying the

12

defendant's Snapchat username, was admitted over the objection, and after additional examination, the State moved to admit People's exhibits 25, a disc containing the individual Snapchat videos; 25(a), a records certification from Snapchat; and 25(c), a disc containing the videos from the defendant's Snapchat account that had been merged into one file. With regard to admission of the exhibits, defense counsel stated, "Ongoing objection." The exhibits were then admitted, and the State was given permission to publish the exhibits.

¶ 33 Sergeant Splittorff was then provided with People's exhibit 15, the handgun used in the shooting, and was asked if he observed that same handgun in the defendant's Snapchat videos. Sergeant Splittorff stated that he observed a strikingly similar firearm in 14 or 15 of the Snapchat videos, and that it had all of the same characteristics, but that he could not say it was the same firearm. He further testified that most of the videos he had observed were filmed inside of the defendant's vehicle, but some were outside of the defendant's residence. The videos had been made in the days, weeks, and months leading up to the shooting. The State then asked for permission to publish People's exhibit 25(c), the merged Snapchat video, and defense counsel objected on grounds of relevance. That objection was overruled and the State played four of the Snapchat videos. After the fourth video, defense counsel stated, "I would object to any further of these. I think they're becoming unnecessarily cumulative and irrelevant. I mean two months before, three months before." The State responded that the videos showed the defendant constantly possessing a firearm that was described as "strikingly similar" to the murder weapon, and that the videos were offered to prove the identity of the defendant as the one who possessed and fired the handgun. Defense counsel responded that the defendant had filed an affirmative defense.

¶ 34 The trial court noted that there had been no admission by the defendant that he had fired the weapon, so the State had the burden to prove that he had done so, and that filing an affirmative

13

defense did not alleviate the State's burden to prove every element of its case. The trial court stated that if there had been a jury, the trial court would have observed all of the videos prior to trial to determine if anything was prejudicial. The trial court also noted that the trial court was the trier of fact, and stated that it would not allow anything in the videos that may be prejudicial to influence its decision. The trial court further stated that if it were a jury trial, then it may have ruled differently, but the videos were allowed because the State had to prove the elements of the case. The State then played ten more Snapchat videos. Sergeant Splittorff testified that some of the same videos he had obtained through the Snapchat search warrant were also obtained during extraction of the defendant's cellular telephone data. After Sergeant Splittorff was cross-examined by defense counsel, the State rested.

¶ 35    The defense then called the defendant to testify as its first and only witness. The defendant testified that he carried a firearm because he worked in a tough area. He testified about his friendship with Vaughn and about the events leading up to the shooting. He then stated that after bar hopping, he and Vaughn returned to the defendant's vehicle and the defendant tried to get Courtland to come out of the car and join the defendant and Vaughn. While the defendant was talking to Courtland, the defendant heard Vaughn say, "[T]here goes that b***h a** dude right there." The defendant started looking around and saw Vaughn jogging toward a group of people. Vaughn then started to throw "haymakers" at one of the individuals who the defendant did not know, and this surprised the defendant. The defendant did not testify to the name of the individual that Vaughn had hit, but the individual was identified by other witnesses at trial as Newsome. The defendant saw Courtland jog over to the fight. A punch was thrown and Newsome fell to the ground. The defendant did not say who threw the punch. The defendant began to approach the

14

fight and saw someone with dreadlocks who had a bottle in his hand. The defendant also did not name this individual, but based on other testimony, he was referring to Hicks.

¶ 36    The defendant testified that he and Hicks both approached the fight, with Hicks still holding the bottle. The defendant stated that they reached each other approximately three to four feet away from the fight. The defendant testified that Hicks then tried to attack Courtland, but Courtland "stutter stepped" backwards. Hicks then turned to the defendant with the bottle, and the defendant pushed Hicks backwards. Hicks then came towards the defendant again with a "look in his eyes that he wasn't gonna quit." The defendant stated that he brandished the firearm he had in his pocket, and that Hicks kept coming towards him. The defendant testified that he then moved backwards and fired a shot. He testified that when Hicks was approaching him, the defendant was backing up and somewhat crouched down. The defendant stated that he fired one shot and that he did not aim for Hicks's head or chest because he was not trying to hit Hicks. The defendant testified that he just wanted to neutralize Hicks to get him to "back off." The defendant stated that Hicks had been holding the bottle by the neck with the bottom up like he was going to swing it. When Hicks was shot, he dropped the bottle and it exploded. The defendant stated that at the time of the shooting, Hicks was in a lunging position coming towards the defendant.

¶ 37    The defendant confirmed on cross-examination that the neck of the bottle was pointed downward when Hicks was holding it. He also testified that at the time of the incident, he was in close proximity to Hicks, and reiterated that Hicks dropped the bottle after the defendant shot Hicks.

¶ 38    For its rebuttal, the State called Officer Jeremiah Dressler of the Alton Police Department. Officer Dressler testified concerning statements made to him by the defendant near the time of the incident. The defendant told Officer Dressler that on the night of the incident, he and Courtland

15

drove to the area of the incident. They parked and sat in the vehicle for 30 minutes talking. The defendant told Officer Dressler that the defendant decided not to stay, left Courtland in that area, and drove directly home to sleep. The defendant stated to Officer Dressler that at approximately 2:00 a.m., Courtland came to the defendant's home and told him that a fight had occurred downtown involving Vaughn. The defendant had to work in the morning, so he and Courtland went to the laundromat to wash their clothes. The defendant told Officer Dressler that he and Courtland left the laundromat but then later returned to get their clothes. Officer Dressler testified that the defendant denied that he was the shooter and did not say anything about being threatened with a bottle. A video of the interview was admitted into evidence.

¶ 39    After Officer Dressler's testimony, the parties gave their closing arguments. In its rebuttal argument, the State highlighted the ways in which the physical evidence in the case did not support the defendant's version of the story. It first noted that the video footage of the incident showed Hicks moving backwards and away when he was shot. It also noted that the bottle that was purported to have been held upside down by Hicks had shattered on the ground and left a puddle of liquid. The State argued that the liquid would not have been present if Hicks had been wielding the bottle upside down for the time period that the defendant claimed Hicks was holding it, as the liquid would have poured out of the bottle during that time. The State also emphasized that the broken bottle was located more than one car length from where Hicks collapsed to the ground after he was shot, and the bottle did not show evidence of being thrown, indicating that Hicks had not been holding the bottle at the time of the shooting.

¶ 40    After adjourning to consider the evidence and the law, the trial court returned and stated that the defendant's prior conviction was only considered for the UUWF charge and no other purpose. The trial court also noted that the Snapchat videos became moot when the defendant took

16

the stand and admitted to shooting the firearm, so no weight was given to any of those videos. The trial court then found the defendant guilty of the UUWF count.

¶ 41 The trial court then discussed its consideration of the first degree murder charge, where it noted that it was undisputed that the defendant fired the shot that killed Hicks. The trial court explained that the only proposition at issue was whether the defendant was justified or not justified in the force he used. The trial court then reviewed the evidence at trial, including the defendant's testimony, Lindsey's testimony, and the video footage. The trial court noted that Lindsey's testimony was credible and consistent with her statement to the police. The trial court stated that if Lindsey was credible, then there was no way the defendant was crouched down during the shooting, and there was no interaction between Hicks and the defendant prior to the shooting.

¶ 42 The trial court then stated what it observed in the surveillance footage from the Firehouse bar. The trial court explained that the video was dark and grainy and had to be watched several times because the events in the video are difficult to discern. The trial court emphasized that it was important that each witness had identified themselves in the video. The trial court then narrated what it observed in the video, and regarding Hicks, stated,

> "And the victim comes away from the fight. He is not moving towards anyone. The testimony of the defendant was that the victim came at him; that he pushed him away, but that he came back at him. And clearly that didn't happen. The victim moved away. The victim was away. And he was standing on the other side of the barricades, clearly not close to the defendant. Which is consistent with what Katelynn Lindsey stated, which was that she was standing in front of the defendant trying to stop him from getting into the fight."

17

¶ 43 The trial court then stated that, based on all of the evidence, it found that the State had proved that the defendant performed the acts that caused the death of Hicks, that the defendant knew such acts created a strong probability of death or great bodily harm to Hicks, and that the defendant was not justified in the force he used. The trial court also found that the defendant failed to prove, by a preponderance of the evidence, that a mitigating factor existed to find the defendant guilty of the lesser offense of second degree murder. The trial court then found the defendant guilty of first degree murder.

¶ 44 On February 9, 2023, the defendant filed a posttrial motion alleging that (1) the evidence at trial was insufficient to prove the defendant guilty beyond a reasonable doubt; (2) the defendant was denied a fair trial; (3) the defendant was denied due process of law; (4) the trial court erred in allowing the State to use the evidence of the defendant's prior sex conviction if he chose to testify, thereby denying the defendant a trial by jury; (5) the trial court erred in allowing numerous Snapchat videos to be played; (6) the trial court erred in denying the defendant's motion for a directed verdict; (7) the trial court erred in its rulings on the evidence at trial; and, (8) cumulative error denied the defendant a fair trial.

¶ 45 On April 14, 2023, the trial court heard the defendant's posttrial motion. The defendant stood on his motion and the State stood on the record; neither side offered additional argument. The trial court then stated, first, that the allegation that the defendant was denied a trial by jury was not true where the defendant made his own decision to waive a jury trial. With regard to the Snapchat videos and other evidence, the trial court stated that as the trier of fact, it only considered evidence that was relevant. The trial court stated that if there was a Snapchat that was not helpful in the decision, the trial court did not consider it. The trial court stated that it only considered the evidence that it should have considered and then denied the defendant's posttrial motion.

18

¶ 46 The trial court next proceeded to sentencing, where it stated that it had received a presentence investigation report (PSI) and then heard arguments from the parties. The State asked the trial court to sentence the defendant to 65 years in IDOC on the first degree murder conviction, and to 10 years in IDOC on the UUWF conviction. The State asked the trial court to consider three aggravating factors; first, the defendant's criminal history, which included a criminal conviction for aggravated criminal sexual assault; second, that the defendant's conduct caused serious harm; and third, the need for deterrence in light of firearms issues in the community.

¶ 47 Defense counsel responded that the defendant's prior felony criminal history occurred when he was a teenager. Defense counsel asked the trial court to consider the remoteness of the incident and asked the trial court to consider the defendant's lack of subsequent criminal history as a factor in mitigation. Defense counsel also asked the trial court to consider in mitigation that the circumstances were unlikely to recur, as the shooting was in response to a fight where the defendant believed he needed to defend himself and others. Defense counsel asked the trial court to consider that the defendant had been, for the most part, a law-abiding citizen since his release from IDOC on the prior felony, that he was working, and that he was starting a family. Defense counsel then asked the trial court to sentence the defendant to the minimum allowable sentence in IDOC, stating, "I think a 20 to 25 years sentence on the murder followed by a minimum for the gun enhancement is what is appropriate in these circumstances." The defendant then gave a statement in allocution, where he stated that he did not mean for this to happen, apologized to the family of Hicks, stated that he was dragged into the situation and was never an aggressor, and stated that he just made a bad decision.

¶ 48 After admonishing the defendant of his appeal rights, the trial court then stated that it considered the defendant's prior conviction as an aggravating factor. The trial court also stated

that the need for deterrence was technically applied as an aggravating factor, but emphasized that it did not believe that the sentence would have much deterrent effect. The trial court then set forth details from the PSI relating to the defendant's age, education, and criminal history. The trial court did not find that any factors in mitigation applied. The trial court stated that it considered the evidence at trial and noted that the defendant was not the initial aggressor, but that he brought a gun to a "fist fight." The trial court stated that if the defendant had not pulled out that gun, then Hicks would still be alive. The trial court further noted that the defendant would have to serve his full sentence, and then stated, "[T]he Court found that you possessed a weapon that you personally discharged that resulted in death of another individual. And that requires this Court to add on to that sentence a minimum of 25 years. So at a minimum today you're looking at 45 years on the murder charge." The trial court then noted that the defendant would also be sentenced for the UUWF conviction, and that the sentence for that conviction had to be consecutive to the first degree murder sentence. The trial court stated that it found the situation tragic, noting that the defendant grew up in IDOC and would probably die in IDOC.

¶ 49 The trial court then sentenced the defendant to 30 years in IDOC, with 25 years added on due to the personal discharge of a firearm resulting in death, for a total of 55 years in IDOC on the first degree murder conviction, with a 3-year MSR period, to be served at 100%. The trial court then sentenced the defendant to 3 years in IDOC for the UUWF conviction, to run consecutive to the 55-year sentence, with a 3-year MSR period, and to be served at 50%.

¶ 50 The defendant filed a motion to reconsider his sentence, asking the trial court to reconsider certain factors in mitigation, which was heard on August 2, 2023. Defense counsel asked the trial court to consider in mitigation that the defendant was acting under strong provocation, in that Hicks was approaching the fight with a broken bottle, and asked the trial court to also consider that

20

there were substantial grounds excusing or justifying the defendant's conduct. Defense counsel further asked the trial court to consider in mitigation that the defendant's conduct was induced by another, in this case Vaughn, who started the fight. The State argued in response that Hicks had essentially been an innocent bystander, and that this was a situation where the defendant was not defending his own pride, but was defending the pride of his friend, and that was the cause of the shooting.

¶ 51 The trial court stated that it did not find that the defendant was acting under a strong provocation. It then stated, "I'm required by law to add on the 25 to life for the firearm, which he got a total of 55 on the murder charge, so he was given 30 for murder plus 25 for the personally discharging of a firearm." For clarity, additional statements by the trial court regarding the sentencing range will be presented in the analysis section of this order. The trial court then noted that the victim was unarmed and was not engaged in a fight with the defendant. The motion to reconsider the sentence was denied and this appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53 On appeal, the defendant argues (1) that his first degree murder conviction should be reduced to second degree murder because he had an unreasonable belief that he needed to act in self-defense, (2) that the trial court abused its discretion in allowing the introduction of surveillance videos and that trial counsel was ineffective for failing to object to the admission of the videos, (3) that the trial court abused its discretion when it admitted 14 Snapchat videos over the defendant's objection, and (4) that his sentence was excessive and the trial court misapprehended the sentencing range.

¶ 54                          A. First Degree Murder

¶ 55    The defendant argues on appeal that this court should reduce his conviction to second degree murder where he had proven, by a preponderance of the evidence, that he had an actual, but unreasonable, belief that deadly force was necessary based on the threat to himself and Courtland. The defendant argues that Hicks threatened the defendant and Courtland with a beer bottle, and the defendant formed a belief that force was necessary to protect himself and his friend from harm. He argues that the unrebutted evidence established that he possessed this subjective belief, and the trial court should have found that the defendant established that he had this belief, even if it was unreasonable, by a preponderance of the evidence.

¶ 56    In support of this argument, the defendant claims that his testimony was corroborated by the testimony of Courtland and by the angle and path of the bullet through Hicks' body. The defendant also notes that the Firehouse's surveillance video was grainy and difficult to see, that most of the incident occurred out of frame, and that the part that was captured was at a distance from the camera. The defendant also argues that it cannot be discerned from the video whether Hicks was shot while on camera or at some point prior to his appearing on camera. The defendant further notes that no witness denied that Hicks was holding a beer bottle, that Lindsey conceded that Hicks was part of the fight and that she had tried to stop the defendant and Courtland from joining the fight, and that nobody else saw the shooting. The defendant ultimately argues that he proved, by a preponderance of the evidence, that he had an unreasonable belief that Hicks was dangerous, that deadly force was necessary to defend the defendant and others against Hicks, and that nothing controverted that evidence.

¶ 57    As charged in this case, to sustain a conviction for first degree murder, the State must prove that a defendant killed another individual without lawful justification, and in performing the acts

which caused the death, he or she intended to kill or do great bodily harm to that individual, or knew that his or her acts created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (2) (West 2022). One of the recognized lawful justifications to first degree murder is the affirmative defense of self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). For the trier of fact to consider self-defense, the defendant must establish some evidence of each of the following six factors: (1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of force applied, and (6) the person's beliefs were objectively reasonable. *Id.* at 127-28. If, after the defendant has offered some evidence as to each factor, the State then disproves the presence of any one of the factors beyond a reasonable doubt, the defendant's claim of self-defense must fail. *Id.* at 128. The trier of fact must then find the defendant guilty of either first or second degree murder. *Id.*

¶ 58    Second degree murder is a lesser mitigated, not a lesser included offense, of first degree murder. *Id.* at 122. A person commits the offense of second degree murder when he commits the offense of first degree murder, as defined by paragraphs (1) or (2) of subsection (a) of section 9-1 of the Code (720 ILCS 5/9-1(a)(1), (2) (West 2022)), and either of the following mitigating factors is present:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or

23

(2) at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." *Id.* § 9-2(a)(1), (2).

¶ 59    Regarding the use of deadly force, section 7-1 of article 7 of the Code (*id.* § 7-1(a)) provides that a person "is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." The reasonableness of an individual's belief that the use of deadly force was necessary depends on the surrounding facts and circumstances and is a question of fact. *People v. Felella*, 131 Ill. 2d 525, 533-34 (1989).

¶ 60    Subpart (2) of the second degree murder statute (720 ILCS 5/9-2(a)(2) (West 2022)), quoted above, sets forth the "imperfect self-defense" form of second degree murder. *Jeffries*, 164 Ill. 2d at 113. This occurs when there is sufficient evidence that a defendant believed he was acting in self-defense, but that belief is objectively unreasonable. *Id.* In the case of imperfect self-defense, a defendant must prove by a preponderance of the evidence the existence of a mitigating factor sufficient to reduce the offense of murder to second degree murder. *Id.* at 129. A defendant is not required to prove the presence of an unreasonable belief in the necessity of the force used, but rather is only required to present some evidence of each of the self-defense factors. *Id.* The trier of fact then determines if the evidence provides absolute justification for the defendant's actions or supports a finding of second degree murder. *Id.*

¶ 61    Whether a defendant's actions were committed under mitigating circumstances is a question of fact. *People v. Romero*, 387 Ill. App. 3d 954, 967-68 (2008). When reviewing a defendant's argument that he presented evidence to prove the existence of a mitigating factor, the

24

reviewing court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 62    The defendant argues that he proved by a preponderance of the evidence that he possessed an unreasonable belief that Hicks presented a danger that justified the use of lethal force, and no evidence at trial contradicted the evidence that he possessed such a belief. After reviewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the defendant failed to prove the existence of a mitigating factor by a preponderance of the evidence.

¶ 63    The defendant testified that he and Hicks reached each other approximately three to four feet away from the fight. The defendant stated that Hicks was holding a bottle by the neck with the bottom up like he was going to swing it. The defendant then testified that Hicks tried to hit Courtland with the bottle, but Courtland "stutter stepped" backwards. The defendant stated that Hicks then turned to the defendant with the bottle, and the defendant pushed Hicks backwards. The defendant testified that Hicks then came towards the defendant again. The defendant stated that he then brandished the firearm that he had in his pocket, and Hicks kept coming towards him. The defendant testified that he was backing up and somewhat crouched down, and that Hicks was lunging towards him. The defendant testified that he moved backwards and fired one shot, but that he did not aim for Hicks' head or chest because he was not trying to hit Hicks. The defendant stated that Hicks dropped the bottle when he was shot and the bottle exploded.

¶ 64    Much of the defendant's version of events, however, was contradicted by other testimony at trial. Courtland testified that, "The guy picked up a beer bottle and tried to hit somebody in the group with it." He did not testify that anyone tried to hit *him* with the bottle, contrary to the

25

defendant's testimony. Courtland further testified that he did not want to get hit with the bottle, so he backed up and moved away. When asked if anyone in the group was hit with the bottle, Courtland stated, "Nah, it ended up slippin', I guess, and breaking it on the ground." He further testified that after the bottle was broken on the ground, he was no longer afraid of it. Courtland testified that after the bottle was no longer in play and had fallen to the ground, the fighting continued, and then he heard a gunshot. Courtland testified that he was wondering why a gun had been drawn because their group had more people than the victim's group.

¶ 65     Courtland's testimony directly contradicts the defendant's testimony that Hicks was holding the bottle at the time that he was shot. Physical evidence at the scene supports Courtland's version of events, where the broken bottle near the scene was more than one car length away from the blood on the ground where Hicks collapsed, suggesting that Hicks dropped the bottle well before he collapsed in the video.

¶ 66     To address this, the defendant argues that the evidence at trial would support a theory that Hicks was not shot while on video at the moment he doubles over and collapses, but rather, was shot prior to his entering the video frame when he was at a location closer to the broken bottle. The video evidence, however, does not support this theory, where in the video Hicks abruptly doubles over at 00:41:32, and at least three of the nearby people begin to react and take cover at that exact same moment and at that exact same time stamp. Less than a second later, Hicks falls to the ground and multiple other individuals begin to react. The reactions of those first three individuals, which occur at the same moment that Hicks abruptly doubles over, include an individual sitting on the sidewalk immediately standing and moving away, and the unidentified woman and Courtland, who enter the frame walking past Hicks at a normal pace, immediately increasing their pace and looking to Hicks, and then running for cover. The remaining nearby

26

individuals then begin to react a second later when Hicks collapses to the ground. These events are not consistent with the shot having been fired at some point prior to Hicks entering the frame, which occurs right as the timestamp changes from 00:41:29 to 00:41:30. Prior to 00:41:32, there is no reaction or change in the demeanor of the nearby individuals other than to notice and watch the fight occurring off camera. The reactions and protective measures of the bystanders begin when Hicks doubles over.

¶ 67    The defendant's version of events is also controverted by the photographic evidence admitted as People's exhibits 101 and 102, which depict the broken bottle that Hicks dropped, and make clear that the bottle did not have a cap on it but did have an amount of liquid in it when it broke. This does not support the defendant's statement that Hicks was holding the bottle upside down throughout the incident, as the liquid would have poured out by the time the bottle broke if it was being held and wielded upside down.

¶ 68    Further, the trial court specifically found Lindsey's testimony to be credible. Lindsey testified that after Vaughn attacked Newsome, and as the fight was moving up the street, two men ran up to the area with their hands in their pockets. At that time, Hicks was behind her and was trying to break up the fight between Vaughn and Newsome. Lindsey put her hand on the defendant's chest and said "please" because Lindsey thought the defendant was about to join the fight. The defendant pulled out a gun and fired a shot. Lindsey saw the gun and saw the defendant's face while he shot the weapon. After she regained her hearing, Lindsey saw the victim on the ground.

¶ 69    The video evidence in this case, which the trial court heavily relied on, supports Lindsey's version of events, as does the physical evidence. The pathologist testified that the bullet entered Hicks' hip in a downward direction. The defendant argues that this is because Hicks was in a

lunging position when the defendant fired from his crouched position. The defendant's argument is directly controverted by the Firehouse bar video, which shows Hicks in an upright position moving backwards prior to his abruptly doubling over and then collapsing to the ground. At no point does the video show Hicks moving forward towards the off-camera incident or lunging. The downward trajectory of the bullet, then, does not support the defendant's testimony that he was crouched down when he fired; it is more consistent with Lindsey's testimony that she placed her hand on his chest, from which the trial court could reasonably infer that the defendant was in an upright, standing position.

¶ 70    The trial court stated exactly that. When announcing its guilty verdict, the trial court stated that it had considered the testimony, photographs, and videos. The trial court noted Courtland's testimony that the bottle did not hit anyone and was already on the ground broken at the time the shot was fired. The trial court stated that it found Lindsey's testimony to be credible and consistent with her prior statements, and noted the contradictions between her testimony and that of the defendant. The trial court specifically noted that Lindsey did not testify as to any interaction between the defendant and Hicks, which contradicted the defendant's testimony that he pushed Hicks, and the trial court also noted that the defendant could not have been crouched down in the context of Lindsey's testimony that she placed her hand on the defendant's chest. Where the testimony at trial is conflicting, the trier of fact "who saw and heard the witnesses testify, was entitled to weigh their credibility, draw reasonable inferences from their testimony, and resolve conflicts in the evidence." *Felella*, 131 Ill. 2d at 534. The reviewing court will not substitute its judgment for that of the trial court. *Id.*

¶ 71    In addition to crediting Lindsey and Courtland's testimony over the defendant's, the trial court discussed in detail how the video evidence, which it observed numerous times, also

28

contradicted the defendant's story. The trial court stated that "the victim comes away from the fight. He is not moving towards anyone." The trial court then noted that the defendant had testified that he pushed Hicks away and Hicks came back towards him. With regard to this testimony, the trial court stated, "And clearly that didn't happen. The victim moved away. The victim was away. And he was standing on the other side of the barricades, clearly not close to the defendant." The trial court also noted that this was consistent with Lindsey's testimony that she was standing in front of the defendant and trying to stop him from joining the fight. The trial court then found that the defendant was not justified in the force he used, and that the defense had failed to prove, by a preponderance of the evidence, that a mitigating factor existed to support a finding of second degree murder.

¶ 72     The trial court could have reasonably concluded that the bottle was broken on the ground at the time of the shooting; that there was no interaction between Hicks and the defendant prior to the shooting; that Hicks never made a move toward the defendant or Courtland after coming away from the fight; and, that the defendant shot Hicks while Hicks was away from the fight, unarmed, and not advancing toward anyone. As noted above, the trial court was entitled to weigh the credibility of witnesses, draw reasonable inferences from their testimony, and resolve conflicts in the evidence. The trial court credited Lindsey's testimony and did not credit the defendant's testimony. Accordingly, viewing the evidence in a light most favorable to the prosecution, we hold that the trial court could have reasonably concluded that the defendant was not acting in defense of himself or another, and did not have an unreasonable belief that Hicks presented a danger to himself or others requiring the use of deadly force. We, thus, will not reduce the defendant's conviction to second degree murder, and affirm his conviction of first degree murder.

¶ 73                                    B. Surveillance Footage

¶ 74    The defendant next argues that the trial court abused its discretion in allowing the State to introduce video exhibits from the Firehouse bar and Spirits Lounge. The defendant states that because Sergeant Roderfeld, who laid the foundation for the videos, did not personally witness the events on video and did not have familiarity with the surveillance systems, a proper foundation was never laid, and the admission of the videos into evidence was reversible error. He also argues that trial counsel was ineffective for failing to object to admission of the videos.

¶ 75    With regard to the foundation of the videos, the defense argues that a foundation for a video may be laid either by someone who witnessed the events in the video, or by someone with knowledge of the process used to create the video under the "silent witness" theory. The defense argues that because Sergeant Roderfeld did not fulfill either of these requirements, he was unable to lay the foundation for the video. Defense counsel also complains that Sergeant Roderfeld provided a narration of the events depicted in the videos. The defendant acknowledges that defense counsel did not object to the admission of the videos, and asks this court to review the admission of the videos under a plain error analysis.

¶ 76    The State argues that the defendant stipulated to the foundation and admission of the videos, and therefore, a plain error analysis is not available where the defendant invited the error. The State notes that in addition to stipulating regarding the videos and not objecting to the admission of the videos at trial, the defendant also did not include admission of the videos as an error in his post-trial motion.

¶ 77    The defendant responds that he did not stipulate as to the foundation and admission of the videos, but rather, stipulated that Sergeant Roderfeld would be permitted to lay that foundation. The defendant notes that a reviewing court must give effect to the intent of the parties, and the

language of the stipulation makes clear that the defendant did not agree that foundation was unnecessary, but rather, agreed that the officer who seized the video could testify as to its foundation and contents. The defendant emphasizes that nothing in the stipulation alleviated the State of its responsibility to lay the proper foundation for the videos, and Sergeant Roderfeld failed to lay an adequate foundation. The defendant also argues that the stipulation did not permit Sergeant Roderfeld to testify as to the contents of the videos to a degree that surpassed what the original custodians of the videos could have testified to.

¶ 78     The stipulation in this case identified individuals from the businesses where the surveillance videos were created and stated that those individuals would testify as to the foundation of the videos. It further stated, "The parties agree that it is not necessary to call these witnesses in trial to admit the surveillance from each of those locations. The police officer who seized each surveillance video shall be allowed to testify as to its foundation and contents." At trial, the State offered the stipulation into evidence as People's exhibit 284. The trial court asked defense counsel, "Is this an accurate stipulation, [defense counsel]?" Defense counsel confirmed that the stipulation was accurate. The trial court then noted that part of the stipulation related to surveillance video and "that the parties [were] stipulating that the police officer who seized the video [could] testify as to its foundation and its contents," and the trial court then asked defense counsel, "Is that accurate, [defense counsel]?" Defense counsel responded, "Yes, Your Honor."

¶ 79     Stipulations are construed like contracts. *People v. Nelson*, 2013 IL App (3d) 110581, ¶ 13. As such, the court's primary goal is to ascertain the intent of the parties. *Id.* The best indication of that intent is the plain language of the agreement, which, when unambiguous, must be enforced as written. *Compass Group v. Illinois Workers' Compensation Comm'n*, 2014 IL App (2d) 121283, ¶ 54. Review of the intent of the parties regarding a stipulation is *de novo*. *Id.* A reviewing court

31

must ascertain and give effect to the intent of the parties, and "[a] stipulation is conclusive as to all matters necessarily included in it." (Internal quotation marks omitted.) *People v. Woods*, 214 Ill. 2d 455, 469 (2005). Furthermore, it is presumed that parties do not insert meaningless words and phrases into contracts. *Valerio v. R. & R. Construction Co.*, 20 Ill. App. 3d 48, 53 (1974). Consequently, no part of a contract may be rejected as meaningless or surplusage unless absolutely necessary. *Gross v. University of Chicago*, 14 Ill. App. 3d 326, 338 (1973).

¶ 80 It is clear in this case, both from the plain language of the stipulation and from the trial court's colloquy with defense counsel regarding the stipulation, that the parties intended for the officer who seized the videos to provide the foundation for those videos. Any ambiguity in the first part of the stipulation, which stated "it is not necessary to call these witnesses in trial to admit the surveillance from each of those locations," is clearly resolved by the immediately following sentence, "The police officer who seized each surveillance video shall be allowed to testify as to its foundation and contents." If the parties had intended that no foundation was required to be laid and the videos were to be admitted without foundation, then inclusion of the portion of the second sentence permitting the police officer to testify regarding the foundation would be meaningless. The intent of the parties to permit, but also to require, the seizing officer to testify as to foundation was further confirmed in the presence of the State at the start of trial. The trial court asked if the stipulation was that the officer who seized the video could testify as to its foundation and contents, and the State did not assert that the stipulation was in fact intended to mean that the video should be admitted outright without any foundation being laid. Accordingly, we find that the stipulation permitted the officer who collected the videos to lay the foundation for the videos, but that the foundation was still required to be laid. Therefore, we do not find that the defendant invited any error by entering into the stipulation regarding the foundation for the videos.

32

¶ 81     As previously stated, the defendant has requested that this court review this issue under the doctrine of plain error. When the State moved to admit the videos, defense counsel did not object, but rather, stated that admission should be permitted subject to cross-examination. The defendant did not elicit any testimony during cross-examination regarding the foundation of the videos and did not object to their admission at any time during or after cross-examination. The defendant also did not include the issue regarding inadequate foundation in his post-trial motion. Where the defendant fails to make a timely objection and therefore forfeits review, the reviewing court will examine the record only for plain error. *People v. Herron*, 215 Ill. 2d 167, 181 (2005). The plain error doctrine allows a reviewing court to remedy a "clear or obvious error" in two circumstances, regardless of the defendant's forfeiture: (1) where the evidence in the case is so closely balanced that the guilty verdict may have resulted from the error and not the evidence or (2) where the error is so serious that the defendant was denied a substantial right, and thus, a fair trial. *People v. McLaurin*, 235 Ill. 2d 478, 489 (2009). Before addressing either of these prongs of the plain error doctrine, however, we must determine whether a "clear or obvious" error occurred at all. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 82     The decision to admit video evidence is within the discretion of the trial court. *People v. Taylor*, 2011 IL 110067, ¶ 27. An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009). Under the silent witness theory, a video recording may be admitted without the testimony of an eyewitness if there is sufficient proof of the reliability of the process that produced the recording. *People v. Dennis*, 2011 IL App (5th) 090346, ¶ 23. Our supreme court has noted that the circumstances of each case, and

33

thus the requirements to guarantee the genuineness of the evidence, will always differ. *Taylor*, 2011 IL 110067, ¶ 34. In *Taylor*, our supreme court went on to state,

> "[T]he appellate court in the case at bar looked to several factors in determining whether a proper foundation had been laid for the admission of the VHS tape: (1) the device's capability for recording and general reliability; (2) competency of the operator; (3) proper operation of the device; (4) showing the manner in which the recording was preserved (chain of custody); (5) identification of the persons, locale, or objects depicted; and (6) explanation of any copying or duplication process. We agree that these factors may be considered when determining whether the process by which a surveillance videotape was produced was reliable. However, like other jurisdictions, we emphasize that this list of factors is nonexclusive. Each case must be evaluated on its own and depending on the facts of the case, some of the factors may not be relevant or additional factors may need to be considered. The dispositive issue in every case is the accuracy and reliability of the process that produced the recording." *Id.* ¶ 35.

¶ 83    With regard to the first three factors, Illinois courts have held that the fact that a recording exists at all is evidence that the recording device was functional and the operator knew how to operate it; further, when the events and persons on the recording are recognizable, it is evidence that the camera was operating properly. See *Id.* ¶ 39; see also *In re D.Q.*, 2016 IL App (1st) 160680, ¶ 28. In this case, prior to admission of the Firehouse's video, Sergeant Roderfeld testified that he was at the scene of the shooting for about six hours securing the area and documenting physical evidence. Sergeant Roderfeld then approached the owner of the Firehouse bar at the business and the owner allowed Sergeant Roderfeld to view the surveillance footage from the time

of the incident. Sergeant Roderfeld was able to see that the surveillance equipment captured a portion of the incident, and that the individuals who had been identified as being involved in the incident during the investigation could be seen and identified in the video. The existence of the video and the manner by which Sergeant Roderfeld was able to first view the video at the location of the recording, as well as his ability to discern through his viewing the location, events and individuals captured in the recording, indicate that the first three factors are satisfied with regard to the Firehouse's video, specifically that the equipment was capable of recording, that the operator of the camera was competent to use the equipment, and that the equipment was operating properly.

¶ 84    With regard to the fourth and sixth factors, Sergeant Roderfeld testified that he placed the video onto a flash drive, the flash drive admitted into evidence was the same flash drive where he had placed the video, and the video on the flash drive was a fair and accurate depiction of the video that he had viewed at the Firehouse bar. While Sergeant Roderfeld did not go into further detail on either the fourth factor, chain of custody, or the sixth factor, his method of copying the video, we find that in this case, where he testified that he viewed the video at its originally recorded location with the owner, placed that video on a flash drive, and testified that the video on the flash drive was a fair and accurate representation of the video that he viewed at the original location, his testimony was sufficient to satisfy the fourth and sixth factors in this case.

¶ 85    With regard to the fifth factor, identification of the location, individuals, or objects depicted, Sergeant Roderfeld was able to testify as to the location of the video as being at the scene of the incident where he had conducted his six-hour investigation. He was also able to testify that the original video had a time stamp that corresponded to the time of the incident. Sergeant Roderfeld was then able to identify various individuals while viewing still images from the video and their corresponding time stamps. Accordingly, we find that the fifth factor was satisfied where

Sergeant Roderfeld was able to identify the location in the video and individuals appearing in the video.

¶ 86    With regard to the Spirits Lounge's video, Sergeant Roderfeld testified that the day after the incident, October 12, 2020, he went to Spirits Lounge, a business near where the incident occurred, and met with the owner of the business. The owner permitted Sergeant Roderfeld to view the business's video surveillance footage from the early morning hours of October 11, 2020. Sergeant Roderfeld testified that by the time he viewed that footage, a vehicle possibly involved in the incident had been identified. Sergeant Roderfeld also had a description of the clothing Vaughn was wearing. When Sergeant Roderfeld watched the Spirits Lounge surveillance video, he was able to observe both the suspect vehicle and Vaughn in the footage at or around the time of the incident. While watching the video, Sergeant Roderfeld noticed an issue with the time stamp, and so the live recording at the time he was present at the business was pulled up. He was then able to observe that the time stamp on the video was approximately five minutes behind the real time. Sergeant Roderfeld testified that People's exhibit 2 was an envelope with the flash drive containing the Spirits Lounge's surveillance video. He testified that the video on the flash drive was a fair and accurate depiction of the video he had observed at Spirits Lounge.

¶ 87    With regard to the first three factors, again, the fact that the recording exists at all, and Sergeant Roderfeld was able to view that footage at its original location on the equipment that recorded it, is evidence that the recording device was functional, and the operator knew how to operate it. Further, relating to the third factor, objects and individuals were identifiable from the video, indicating that the camera was operating properly. With regard to the fourth and sixth factors, Sergeant Roderfeld did not testify as to how the video was copied onto the flash drive; however, he did testify that the video on the flash drive was a fair and accurate depiction of the

36

video he had viewed directly on the Spirits Lounge surveillance system. The video was admitted into evidence without objection but subject to cross-examination, and Sergeant Roderfeld was then able to identify both Vaughn and the vehicle in the Spirits Lounge's video.

¶ 88    This court has previously found that an adequate foundation was laid where a law enforcement officer testified that, after investigating the scene of an incident, he viewed a surveillance video on screen at the business where the footage was recorded, the video was copied onto storage media, and the events depicted on the storage media were a fair and accurate copy of the surveillance video that had been viewed previously directly from the original surveillance equipment. *Dennis*, 2011 IL App (5th) 090346, ¶ 26. In that case the State had provided sufficient proof of reliability of the process that produced the video recording for admission under the silent witness theory. *Id.* ¶ 27. The *Dennis* court explained that when a defendant fails to produce evidence of tampering, substitution, or contamination of a video, as in the case currently before this court, the State need only establish a probability that tampering did not occur, and further, even when links are missing in a chain of custody, testimony describing the condition of the evidence when it was collected that matches the condition of the evidence when it is examined is sufficient to establish a chain of custody. *Id.* ¶ 28.

¶ 89    The dispositive issue in every silent witness theory case is the accuracy and reliability of the process that produced the recording. *Taylor*, 2011 IL 110067, ¶ 35. We find that, in the context of the stipulation of the parties that Sergeant Roderfeld could testify as to the foundation and contents of the videos, Sergeant Roderfeld's testimony established a sufficient foundation for the admission of the video from Firehouse bar, as each of the six factors was satisfied to a sufficient degree to ensure the accuracy and reliability of the process used to produce the recording.

¶ 90    With regard to the footage from Spirits Lounge, we also find that Sergeant Roderfeld's testimony was sufficient, in the context of the stipulation in this case and the absence of any allegation of tampering, substitution, or contamination, to lay a foundation for admission of the video. He viewed the video on site on the original surveillance equipment, the video was copied onto storage media, and he testified that the video he viewed in court from the storage media was a fair and accurate representation of the video he had viewed at the business.

¶ 91    We briefly note that the defendant also complains of Sergeant Roderfeld's testimony regarding what is depicted in the videos. The plain language of the stipulation in this case, however, stated that Sergeant Roderfeld, the collecting officer, could testify as to the contents of the video. Just as we do not add to the stipulation any absolution of the State's burden to provide foundation for the video footage, we will not add a limitation as to what aspects of the videos' contents the defendant agreed that Sergeant Roderfeld could testify to, especially where the defendant confirmed at trial that the stipulation allowed Sergeant Roderfeld to testify as to the contents of the video, did not object to the testimony, and did not include the issue in a posttrial motion.

¶ 92    For the foregoing reasons, we find no error in the trial court's admission of the videos or in the officer's testimony concerning the content of the videos. Because we find no plain error, the procedural default of forfeiture remains, and we find that the defendant has forfeited this issue on appeal.

¶ 93    The defendant also argues that defense counsel rendered ineffective assistance of counsel for failing to object to the admission of the videos. Absent a clear or obvious error, neither the doctrine of plain error nor a theory of ineffective assistance of counsel affords any relief from the forfeiture. *People v. Gilker*, 2023 IL App (4th) 220914, ¶ 110. Here, we have found no clear or

obvious error and as such, the procedural default of forfeiture applies, and the defendant's claim of ineffective assistance is also forfeited.

¶ 94                                    C. Snapchat Videos

¶ 95    The defendant next argues that the trial court erred in admitting 14 videos from his Snapchat account into evidence because the videos had no probative value, contained evidence of other crimes or bad acts, and were irrelevant and highly prejudicial. The defendant argues that the State introduced the videos to link the firearm to the defendant when there was already overwhelming evidence of the same and that the defense had filed an affirmative defense of self-defense, so there was no dispute of whether he had discharged the firearm. He also argues that the 14 Snapchat videos were cumulative given that the State presented uncontroverted evidence that the defendant was linked to the firearm by tracing the movement of the bag containing the firearm, by presenting testimony from a ballistics expert who linked the firearm to the shooting, and by presenting the testimony of Lindsey regarding the type of firearm she saw the defendant use, which matched the firearm recovered from the bag. The defendant also argues that the videos were prejudicial because each of the 14 Snapchat videos included a large volume of other crimes evidence, such as gang affiliation, that had not been properly admitted into evidence. The defendant argues that the other crimes evidence was presented purely for its prejudicial effect on the trier of fact, that one video was enough to accomplish the State's purpose of linking the firearm to the defendant, and that the rest of the videos were played by the State to paint the defendant as a bad person who was emboldened by his weapon and more likely to commit a crime with it. The defendant finally argues that, despite knowing that irrelevant and prejudicial evidence could be redacted, the State neglected its duty to take steps to exclude harmful and inadmissible evidence

from trial by failing to redact the Snapchat videos. As such, the defendant argues that admission of the videos was in error, and the error was not harmless.

¶ 96    The State argues that the videos were relevant in that the defendant's possession of the firearm used in the shooting around 14 times in the two months prior to the shooting was probative both of the UUWF charge and of the first degree murder charge. The State argues that the evidence made it more probable that the defendant was in possession of and used that firearm on the night of the shooting. The State notes that at the time when the videos were admitted into evidence, the defendant had neither testified nor stipulated to the fact that he was the one who fired the shot, so the State had the burden to prove every element of its case. The State argues that the Snapchat videos comprised a small part of its evidence, where the videos were introduced through one witness and together were only seven minutes and 18 seconds in length. The State finally argues that this was a bench trial, the trial court stated at the time of admission that it would not consider anything prejudicial in the videos, and the trial court stated that it did not consider the Snapchat videos in reaching its verdict, so any error in the admission of the videos was harmless.

¶ 97    The defendant responds that the probative value of the videos was *de minimis* because the defendant never contested that the firearm was his and the State had already proven the defendant's possession of the firearm. He further responds that each Snapchat video contained other crimes evidence, and that they were shown one after the other, thereby compounding the prejudicial effect and making the videos unduly and needlessly repetitive of other crimes which did not assist the trier of fact in reaching its verdict. The defendant further argues that he does not contest the basic relevance of the videos, but instead argues that the sheer volume of 14 videos, which are unedited and filled with irrelevant content, rendered the videos irrelevant and cumulative.

¶ 98    The defendant's final argument states that the trial court allowed the videos to be admitted in order for the State to prove its case, which the trial court explained would be relevant to its necessary findings. The defendant then notes that when it found the defendant guilty, the trial court stated that it did not give any weight to the videos after the defendant confirmed his identity through his testimony. The defendant states that at the posttrial motion hearing, however, the trial court then stated that it had only considered the Snapchat videos if it found them "relevant or helpful" in its findings. As such, the defendant argues that the trial court's statement at the posttrial motion hearing was a departure from the trial court's statement at the time of the verdict, where it stated that the videos were not considered at all. The defendant concludes that because any consideration of the videos would be improper, the admission of the videos was not harmless, and a new trial should be ordered.

¶ 99    We begin our analysis of this issue by quoting the full language used by the trial court at the posttrial motion hearing, rather than the selective quotation offered by the defendant, where the trial court stated as follows:

> "There [were] other things added to [the posttrial motion] that just talked about errors by allowing in Snapchats or allowing in certain evidence. I would just simply note that as the trier of fact in this case, I only considered the evidence that was relevant. If I didn't find it to be relevant or helpful in reaching a verdict, I did not consider it. So if there was a Snapchat that was not relevant or after watching it just didn't help in the decision on whether or not [the defendant] was guilty of this offense, then I didn't consider it. So I only considered that evidence that I should."

Where the defendant states in his brief that the trial court stated that "it only considered the Snapchat videos if it found them 'relevant or helpful' in its findings," he incorrectly paraphrases

41

the trial court, suggesting that the trial court indicated that it had considered Snapchat videos that were relevant and helpful. This does not accurately portray the statement of the trial court, which was that it *did not* consider unhelpful or irrelevant Snapchat videos. Nowhere in the record did the trial court indicate that it *had* considered relevant or helpful Snapchat videos. It only stated that if there were irrelevant or nonhelpful Snapchat videos, it did not consider them.

¶ 100   This statement is wholly consistent with the language the trial court used at the end of trial when it announced its verdict, stating

"I would also note the significance of the videos played by the State to prove that the defendant was familiar with or possessed a firearm that ultimately was determined to be the gun that was used to kill Terence Hicks became moot once the defendant took the stand and admitted that he was the person who shot and killed Terence Hicks. For that reason, the Court did not give any weight to those videos in reaching its findings today."

¶ 101   The trial court specifically stated when announcing its verdict that it gave no weight to the Snapchat videos. The trial court further stated at the posttrial motion hearing that it did not consider any irrelevant or unhelpful Snapchat videos. Contrary to the defendant's argument and rephrasing of the trial court's statement at the posttrial motion hearing, there was no departure by the trial court from its announcement at trial that the videos were moot and were not given any weight since on both occasions, the trial court stated that the Snapchat videos were not considered.

¶ 102   Erroneous admission of evidence is subject to a harmless error analysis. *People v. King*, 2020 IL 123926, ¶ 40. "An evidentiary error is harmless where there is no reasonable probability that the jury would have acquitted the defendant absent the error." (Emphasis and internal quotation marks omitted.) *People v. Pinkett*, 2023 IL 127223, ¶ 39.

42

¶ 103   In this case, we need not determine whether the Snapchat videos were erroneously admitted, as there is no reasonable probability that the finder of fact would have acquitted the defendant in the absence of the Snapchat videos. As noted, this was a bench trial in which the trial court stated at the time of admission of the Snapchat videos that it would not allow any prejudicial material in the videos to affect its decision, stated at the time of its verdict that it gave the Snapchat videos no weight, and at the time of the posttrial motion again reiterated that it did not give any weight to any irrelevant or unhelpful Snapchat videos. In a bench trial it is presumed that the trial court considered only competent evidence in reaching its verdict. *People v. Naylor*, 229 Ill. 2d 584, 603-604 (2008). That presumption is only rebutted where the record affirmatively shows the contrary; only when it affirmatively appears from the record that the trial court considered incompetent evidence prejudicial to the defendant will the judgment be reversed. *Id.*

¶ 104   The record in this case does not affirmatively demonstrate that the trial court considered the Snapchat videos in reaching its verdict. On the contrary, the record makes clear that the videos were not considered. The trial court explained in detail which evidence formed the basis of its findings, specifically, the testimony of Courtland, the testimony of Lindsey, and the video evidence demonstrating that Hicks was moving away from the fight when he was shot. The trial court expressly stated that it did not consider the disputed Snapchat videos, and the defendant fails to identify anything in the record that rebuts the presumption that the trial court only considered competent evidence; the defendant, therefore, cannot demonstrate that there is a reasonable probability that he would have been acquitted absent the Snapchat videos.

¶ 105   We need not determine whether the Snapchat videos were erroneously admitted because the record does not rebut the presumption that the trial court only considered competent evidence.

43

Accordingly, we find any error in the admission of the Snapchat videos was harmless and not prejudicial to the defendant.

¶ 106                                    D. Sentence

¶ 107   The defendant next argues that his sentence was excessive or that, in the alternative, the trial court misapprehended the sentencing range applicable to the defendant in this case. For the following reasons, we affirm the trial court's sentence.

¶ 108                              *1. Excessive Sentence*

¶ 109   The defendant argues that his sentence of 55 years in IDOC for first degree murder, which was 10 years above the minimum and includes a mandatory 25-year firearm enhancement, was excessive, and the trial court abused its discretion in fashioning the sentence. In support, the defendant points out that he was only 30 years old at the time of sentencing and his sentence contemplates his release from prison at age 85, which he argues is not a *de facto* life sentence under Illinois law, but exceeds the federal government's definition of a *de facto* life sentence. He notes that the trial court observed that the defendant would probably die in prison. He argues the sentence is excessive where the defendant believed he was acting in self-defense, was unlikely to re-offend, and was a productive member of the community with a family and high rehabilitative potential. The defendant argues that this court should reduce the defendant's sentence or remand the case for resentencing pursuant to the unique circumstances of the offense and the defendant's rehabilitative potential.

¶ 110   The State argues that the defendant's sentence is not a *de facto* life sentence under Illinois law, and that a *de facto* life sentence itself does not render a sentence excessive or unconstitutional. The State notes that the existence of mitigating factors does not require the imposition of the minimum sentence or preclude imposition of the maximum sentence. The State argues that the

44

defendant acknowledges that the trial court considered the mitigating factors in the case, but asks the reviewing court to re-weigh those factors, essentially asking this court to substitute its own judgment for that of the trial court. The State notes that the defendant's sentence was only 10 years above the minimum sentence in this case, but was also 30 years below the statutory maximum. It also notes that the trial court imposed the minimum statutory firearm enhancement of 25 years, although it could have imposed up to a life sentence. The State concludes that the trial court's sentence was not an abuse of discretion because it was not greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.

¶ 111　A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). The sentence must be based on the particular circumstances of the case, including (1) the defendant's history, character, and rehabilitative potential; (2) the seriousness of the offense; (3) the need to protect society; and (4) the need for punishment and deterrence. *People v. Klein*, 2022 IL App (4th) 200599, ¶ 34. "[A] trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation." *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003). The existence of mitigating factors does not require the imposition of a minimum sentence nor preclude the imposition of a maximum sentence. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). The trial court must "balance relevant factors and make a reasoned decision as to the appropriate punishment in each case." *People v. Latona*, 184 Ill. 2d 260, 272 (1998).

¶ 112　A sentence within the statutory range is presumed proper. *People v. Webster*, 2023 IL 128428, ¶ 21. Appellate review of a sentence fashioned by the trial court is limited to whether the record discloses that the trial court's sentencing decision was unlawful or an abuse of discretion.

*People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 111. An abuse of discretion will be found where the sentencing court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Hall*, 195 Ill. 2d 1, 20 (2000). The trial court is granted this deference because the trial court is in a superior position to assess the credibility of the witnesses and to weigh the evidence presented at the sentencing hearing. *Jones*, 168 Ill. 2d at 373. Consequently, a reviewing court may not overturn a sentence merely because it might have weighed the pertinent factors differently. *People v. McGowan*, 2013 IL App (2d) 111083, ¶ 10. An abuse of discretion may be found, however, even if the sentence is within the statutory range, if it is contrary to the purpose and spirit of the law. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 33.

¶ 113   We first address the defendant's claim that he received a *de facto* life sentence in this matter. As the defendant acknowledges, the defendant did not receive a prohibited *de facto* life sentence under Illinois law. In Illinois, a "*de facto* life sentence" is a term of art that only applies to juveniles sentenced to more than 40 years of incarceration without the possibility of parole. *People v. Aguilar*, 2024 IL App (1st) 220470-U, ¶¶ 42-44. The rule clearly does not apply in this case, as the defendant was not a minor or even an emerging adult; at the time of the shooting he was approximately 30 years old. The defendant acknowledges that Illinois law regarding *de facto* life sentences does not apply to him, but asks this court to consider a report generated by the United States Sentencing Commission wherein the commission stated, "Within this report, any sentence of imprisonment 470 months or longer is considered a *de facto* life sentence." U.S. Sent'g Comm'n, Life Sentences in the Federal System, 16 (2022). In his brief, the defendant improperly characterizes the information contained in that report as "the federal government's definition of a *de facto* life sentence." The report clearly states that a definition was chosen for purposes of the

report, and the defendant cites no authority adopting such a definition for any authoritative purpose. Regardless, while the defendant may spend the rest of his life serving his prison sentence, a "*de facto* life sentence" in and of itself does not render a sentence excessive or unconstitutional. *People v. Towns*, 2020 IL App (1st) 171145, ¶ 46.

¶ 114　The defendant was convicted of first degree murder, with a finding that he personally discharged a firearm causing the death of another, and UUWF. The defendant does not dispute his UUWF sentence. The statutory sentence for first degree murder is 20 to 60 years of imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2022). Because the defendant personally discharged a firearm during the commission of first degree murder that caused the death of the victim, there is a mandatory sentencing enhancement of 25 years to natural life of imprisonment. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2022). The trial court sentenced the defendant to 30 years in IDOC for first degree murder, which was 10 years above the minimum sentence and 30 years below the maximum sentence. For the firearm enhancement, the trial court imposed the minimum additional sentence of 25 years. Accordingly, the defendant's sentences were well within the statutory range and, thus, we presume his sentences were proper.

¶ 115　The record demonstrates that the trial court considered the evidence and argument in mitigation presented at the sentencing hearing and found that none of the factors applied to the defendant. Defense counsel asked the trial court to consider that the defendant was a young man when he was incarcerated as a juvenile, and he was still a very young man at age 30, that the circumstances in this case were unlikely to reoccur, and that the defendant had been living a productive life. Defense counsel also noted that while the trial court rejected the defendant's self-defense claim, the defendant did testify that he felt he needed to defend himself, and he only fired one shot and left the area.

¶ 116    When announcing its sentence, the trial court discussed at length the defendant's age and unique history, noting that he was incarcerated as a juvenile, was transferred to IDOC at age 18, and then after his release had only minor violations until this incident. The record also demonstrates that the trial court took the defendant's rehabilitative potential into consideration where it considered the pretrial sentence investigation and the defendant's statement in allocution. The trial court also noted that it had considered the evidence at trial regarding the circumstances of the incident and the reasons for its verdict, stating that it would not reiterate that basis again.

¶ 117    The record further demonstrates that the trial court also considered aggravating factors in imposing the defendant's sentences. The trial court stated that the defendant's prior conviction would apply as a factor in aggravation. The trial court noted that the deterrence factor also applied, but indicated that it was only considering that factor because it was required to, and that it did not believe the sentence handed down to the defendant would deter others.

¶ 118    Despite this, the defendant maintains that his sentence was excessive and this court should either reduce his sentence or remand the case for another sentencing hearing. We disagree. There is no evidence in the record that the trial court ignored any factors in mitigation; indeed, every factor identified by the defendant was addressed by the trial court in announcing its sentence. The defendant essentially asks this court to re-weigh the factors, a task we cannot undertake.

¶ 119    A sentence within the statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Cabrera*, 116 Ill. 2d 474, 493-94 (1987). The spirit and purpose of the law are promoted when the trial court's sentence both reflects the seriousness of the offense and sufficiently considers the defendant's rehabilitative potential. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). The seriousness of the offense is the most important sentencing factor, and the

trial court need not give greater weight to rehabilitation or mitigating factors than to the severity of the offense. *Aquisto*, 2022 IL App (4th) 200081, ¶ 112.

¶ 120   The defendant has not overcome the presumption that his sentences, which were within the statutory range, were proper. Indeed, the defendant's sentence is proportionate to his offense. The defendant was not a juvenile at the time of the shooting; he was 30 years old. Further, the evidence at trial showed that the defendant fatally shot an unarmed victim who was moving away from him at the time of the shooting. The trial court emphasized the seriousness of the offense when it stated, "If you had never pulled out a gun, there'd [have] been no gun there that night and Terence Hicks might still be alive. You made a terrible decision." The trial court was not required to afford greater weight to the rehabilitation potential or mitigating factors than to the severity of the offense. The trial court had discretion to sentence the defendant to 85 years in prison on the first degree murder charge with the firearm enhancement, but ultimately found a 55-year sentence was fair. The trial court's sentence was consistent with the purpose and the spirit of the law, the trial court considered the seriousness of the offense, the factors in mitigation and aggravation, and the defendant's rehabilitative potential, and the sentence was not arbitrary, fanciful, or unreasonable. Accordingly, we find that the trial court did not abuse its discretion in fashioning the defendant's sentence.

¶ 121                                       *2. Sentencing Range*

¶ 122   The defendant finally argues that this court should remand the case for re-sentencing because the trial court misapprehended the sentencing range. The defendant argues that the trial court was unaware that it could have sentenced the defendant to less than the mandatory minimum sentence if it found that the minimum sentence violated the proportionate penalties clause of the Illinois Constitution. The defendant states that the trial court erroneously believed that under no circumstances could it impose a sentence of less than 45 years; 20 for first degree murder, and 25

49

years for the mandatory statutory firearm enhancement. The defendant argues that because the proportionate penalties clause allowed the trial court to impose a sentence below the minimum, the trial court misapprehended the correct sentencing range when it believed that it had no other option than to impose a sentence of at least 45 years in prison. The defendant emphasizes that the trial court repeatedly stated that it was imposing the 25-year firearm enhancement only because it was required to do so by law. The defendant argues that the trial court's continued assertion that it was limited by the statutory minimum demonstrates (1) that it was unaware that it had the constitutional authority to impose a lesser sentence and (2) that the defendant's sentence would have been different had the trial court been aware that is was not restricted by the minimums in sentencing. The defendant argues that because the trial court misapprehended the sentencing range that applied to the defendant, this court should vacate the defendant's sentence and remand to the trial court for resentencing.

¶ 123    The State argues that the trial court was without authority to impose a sentence that does not conform to the statutory guidelines, and any unauthorized sentence is illegal and void. The State further argues that the defendant invited any error regarding departure from the statutory guidelines when he explicitly asked the trial court to impose a sentence within the statutory range. The State notes that the defendant never argued that the sentencing guidelines were unconstitutional as applied to him. The State further notes that the defendant does not now claim that the sentencing statute was unconstitutional as applied to him and does not claim trial counsel was ineffective for failing to raise an as-applied constitutional challenge. The State notes that the defendant's argument is limited to the trial court not understanding that it could impose a lower sentence if it found that the statutory minimum sentence violated the Illinois constitution.

¶ 124   The defendant clarifies in his reply brief that his position is not that the trial court should have, *sua sponte*, found that the sentencing requirements were unconstitutional. Rather, his argument is that the trial court repeatedly indicated that it was required to impose the minimum sentence, when it could have imposed a lesser sentence under the Illinois constitution, and the trial court therefore, misapprehended the law.

¶ 125   The proportionate penalties clause of the Illinois constitution allows courts to deviate from the statutory minimum sentence in certain situations. Ill. Const. 1970, art. 1, § 11; *People v. Miller*, 202 Ill. 2d 328, 338. A statutory sentence violates the proportionate penalties clause when the punishment is found to be "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *Id.*

¶ 126   The trial court is presumed to know the law and to have applied it properly, and that presumption is only rebutted when the record contains " 'strong affirmative evidence to the contrary.' " *People v. Campbell*, 2025 IL App (5th) 230203-U, ¶ 41 (quoting *People v. Howery*, 178 Ill. 2d 1, 32-33 (1997)). The defendant emphasizes two statements by the trial court to suggest that it was unaware of the proportional penalties clause. The first of these is at sentencing where the trial court stated that the firearm enhancement "requires this court to add on to that sentence a minimum of 25 years. So at minimum today you're looking at 45 years on the murder charge." The second is at the hearing on the motion to reconsider the sentence, where the trial court stated,

> "I would note that I considered all the factors in mitigation and aggravation at the sentencing hearing. I considered the facts adduced at trial. I did not find that [the defendant] was acting under a strong provocation. And I would also note that the sentence handed down by this Court on the charge of First Degree Murder, *I'm required by law to add on the 25 to life for the firearm*, which he got a total of 55

51

on the murder charge, so he was given 30 for murder plus 25 for the personally discharging of a firearm. [The defendant] could have received up to 60 years on the offense of murder, but I didn't give him 60 years. I gave him 30, ten over the minimum. And the reason I did that was because I considered all of the factors in mitigation. I considered the facts adduced at trial. I considered everything that I'm supposed to consider. And that is why I gave him 30. *I'm required to add on the 25 for the personally discharging of a firearm. That's just something that the statute is requiring of the Court, so I did that.* But if you look at the sentence I handed down, while I don't think for a minute that 55 years is no big deal, I completely understand that it is, *but I'm required to add on 25*. I gave 30, which is closer to the minimum. And the evidence in this case was well beyond a reasonable doubt. There was no question that the victim in this case was unarmed, was not engaged with the defendant at the time that this all was taking place. The defendant brought a gun to a fist fight, and a man died." (Emphases added.)

¶ 127 As noted previously, the statutory sentencing range for first degree murder was 20 to 60 years' imprisonment, with a 25 to natural life mandatory add-on for personal discharge of the firearm which proximately caused the death of the victim. 730 ILCS 5/5-4.5-20(a) (West 2022), 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2022). The defendant asks this court to interpret the trial court's repeated statement that it was required to follow the minimum sentencing guidelines as an indication that the trial court was ignorant of its ability to impose a lesser sentence if the statutory minimum was cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. We decline to do so, as we find no strong affirmative evidence in the record to conclude that the trial court did not know the law or apply it properly.

¶ 128   The trial court's statements in no way indicate that it found the minimum sentence cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community. On the contrary, the trial court clearly *did not* find the minimum sentence to be cruel, degrading, or shocking; in its discussion of its sentence, it did not express any sentiment that the minimum sentence was inappropriate. Rather, it noted that the victim was unarmed and was not engaged with the defendant, and that the defendant had brought a gun to a fistfight and a man had died. We do not find strong evidence that the trial court did not know the law or apply it properly where it correctly stated the minimum sentence and made clear that it found the sentence to be appropriate in light of the defendant's conduct. The trial court's failure to discuss what it *could have* done if it had determined that the minimum sentence was cruel, degrading, or shocking is not an indication that it was unaware of the same, and certainly does not amount to strong evidence of the trial court's ignorance of the law.

¶ 129   Further, "[a] trial court's misapprehension of a minimum sentence necessitates a new sentencing hearing when it appears that the trial court's misunderstanding arguably influenced the sentencing decision." *People v. Hurley*, 277 Ill. App. 3d 684, 687 (1996). We reiterate that the trial court's discussion of the sentence emphasized the seriousness of the defendant's conduct, but even more compellingly, we note that the trial court sentenced the defendant to ten years above the statutory minimum. Even if the trial court did have some misunderstanding of its authority to impose a sentence under the minimum statutory sentence in certain circumstances, which again is not supported by the record in this case, it is clear that any such misunderstanding did not influence the sentencing decision where the sentence imposed was ten years above the minimum. It does not stand to reason that the trial court found the minimum sentence to be cruel, degrading, or shocking, but was unaware that it could impose a lesser sentence in that context, and therefore chose to

impose a sentence ten years above the minimum. The defendant's argument is entirely without merit.

¶ 130   Because there is no strong evidence in the record that the trial court misapprehended the law, we will not vacate the defendant's sentence. We affirm the trial court where it correctly stated and applied the law when it sentenced the defendant on the first degree murder charge.

¶ 131                                III. CONCLUSION

¶ 132   We affirm the defendant's conviction for first degree murder where the defendant failed to prove a mitigating factor by a preponderance of the evidence; the defendant forfeited any issue regarding the admission of surveillance video evidence; the trial court did not abuse its discretion in its rulings regarding the admission of certain video evidence or in fashioning a sentence; and the trial court did not misapprehend the sentencing range.

¶ 133   Affirmed.